UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BASHIR YASIN MOHAMUD,

        Plaintiff,

v.

HEATHER WEYKER, *in her individual capacity as a St. Paul Police Officer*; JOHN BANDEMER, *in his individual and official capacities as a St. Paul Police Sergeant*; JOHN DOES 3-4, *in their individual and official capacities as supervisory members of the St. Paul Police Department*; THE CITY OF ST. PAUL,

        Defendants.

Case No. 16cv1894 (JNE/TNL)
ORDER

### I.    INTRODUCTION

Plaintiff Bashir Yasin Mohamud alleges violations of his constitutional rights in an investigation that led to his indictment by a federal grand jury and his subsequent arrest. He sues Defendants Heather Weyker, a police officer for the St. Paul Police Department in Minnesota; John Bandemer, a St. Paul Police Department sergeant who is alleged to have been Weyker's supervisor; John Does 3-4, who are allegedly supervisory St. Paul police officers; and the City of St. Paul ("St. Paul"). Weyker and Bandemer move to dismiss Mohamud's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and on absolute and qualified immunity grounds. Dkt. No. 38. St. Paul moves on behalf of the City of St. Paul and John Does 3-4 for judgment on the pleadings pursuant to Rule 12(c). Dkt. No. 44.

The investigation at the core of Mohamud's civil complaint targeted a suspected venture involving the sex-trafficking of minor girls across Minnesota, Tennessee, and Ohio. The investigation resulted in the criminal indictment of thirty people, mostly Somali, in the Middle

District of Tennessee in 2010-2011 ("Tennessee Case").  Mohamud alleges that Weyker and Bandemer fabricated evidence about him and others throughout the investigation, resulting in a tainted indictment that was further corrupted by Weyker's continuing deception, and causing his arrest and detention without probable cause.

Nineteen of Mohamud's co-defendants in the Tennessee Case bring separate suits similarly alleging constitutional violations, and a twenty-first person brings another related civil suit.  The parties agreed to coordinated briefing on the Defendants' motions.  The Court assumes familiarity with its fuller opinion in one of the related cases, *Osman v. Weyker, et al.*, No. 16cv908 ("Osman Opinion") (filed simultaneously herewith), and will not repeat that opinion's discussion verbatim here.  Mohamud, coordinating with the other plaintiffs represented by his counsel, opposed the Defendants' motions.  *See* GBBS Pls.' Opp. to St. Paul Mot., Dkt. No. 49; GBBS Pls.' Opp. to DOJ Mot. to Dismiss ("GBBS DOJ Opp."), Dkt. No. 52.

The Court held a hearing on Defendants' motions on May 3, 2017, and now grants in part and denies in part Weyker and Bandemer's motion and grants St. Paul's motion.[1]

**II.     APPLICABLE STANDARDS**

A motion to dismiss or a motion for judgment on the pleadings is appropriately granted "only when there is no dispute as to any material facts and the moving party is entitled to judgment as a [m]atter of law." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (citation omitted).  To survive a Rule 12 motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

---

[1] The United States also filed a Motion to Substitute and Dismiss, which was mooted by stipulation as recognized by the April 12, 2017 Order Permitting the GBBS Plaintiffs to Amend Complaints. Dkt. No. 59.  Pursuant to that order, Mohamud filed an Amended Complaint [Dkt. No. 60] ("AC"), which is thus the operative complaint subject to these Rule 12 motions.

U.S. 662, 678 (2009) (citation omitted); *Haney v. Portfolio Recovery Assocs., LLC*, 837 F.3d 918, 924 (8th Cir. 2016), *as amended* (Dec. 27, 2016). *See also* Osman Op. 3-4.

## III. ALLEGATIONS

Most of the allegations are similar to those alleged by Osman and summarized and analyzed in the Court's order in that case. *See, e.g.*, Osman Op. 4-8. The Court briefly recounts some allegations in Mohamud's Amended Complaint and some facts gleaned from the Tennessee Case record.[2]

On November 3, 2010, Mohamud was charged in a First Superseding Indictment ("FSI") in the Tennessee Case. AC ¶ 17. He was charged in only two counts. Counts 1 and 2 charged him with conspiracy to violate 18 U.S.C. § 1591(a), which criminalizes the sex trafficking of minors, sex trafficking by force, fraud, or coercion, and knowingly benefiting from participating in such a sex-trafficking venture. AC ¶ 17. A Second Superseding Indictment was later filed that included the same charges against Mohamud. AC ¶ 18; *United States v. Mohamud*, No. 3:10cr260, Dkt. No. 591 (M.D. Tenn. May 4, 2011).

Mohamud was arrested on November 8, 2010. AC ¶ 13. On December 2, 2010, he waived his right to a detention hearing, reserving "his right to seek release at some point in the future if appropriate," and he was ordered to be detained in custody. *United States v. Mohamud*, No. 3:10cr260, Dkt. No. 1006, at 2 (M.D. Tenn. Dec. 15, 2011) (submitted in this civil case as DOJ Br. Ex. D, Dkt. No. 41-1).

The counts as against Mohamud exclusively involved the supposed witness-victim Jane Doe Four. AC ¶ 20. The indictment alleged that on March 11, 2010, Mohamud and others transported Jane Doe Four to a hotel in Richfield, Minnesota, where Mohamud rented a room.

---

[2] The Court may take judicial notice of public documents in the Tennessee Case record. *Greenman*, 787 F.3d at 887.

3

AC ¶ 21.  It alleged that "[i]n this room," Mohamud "and other males through force and fraud, had non-consensual sex with Jane Doe Four," who was then 18 years old.  FSI ¶¶ 59-60; AC ¶ 21.  "There was never any such [sex-trafficking] conspiracy[,] and Mohamud never engaged in any attempt to have Jane Doe Four or any others engage in commercial sex. . . . Fabricated evidence formed the basis of this false allegation against Mohamud."  AC ¶ 22.  "Further, no such non-consensual sex occurred between Mohamud and Jane Doe Four."  AC ¶ 23.  Mohamud did rent a room in a hotel in Richfield on March 10-11, 2010, and he was there with Jane Doe Four on those dates.  AC ¶¶ 24-25.  Jane Doe Four "was a willing participant in a party that occurred in that room," and she engaged in consensual sexual activities with Mohamud at the party.  AC ¶¶ 25-26.  The Richfield Police Department interviewed Mohamud about the party only after the Tennessee Case prosecutor contacted them and informed them that "this alleged incident involving Jane Doe Four was likely related to [the prosecutor's] investigation involving human sex trafficking in Nashville, Tennessee—the same 'ring' being investigated by Weyker and Bandemer."  AC ¶¶ 27-28.  Weyker was the lead investigator on the case, and Bandemer was her supervisor in the St. Paul Police Department.  AC ¶ 16.  "Mohamud was never charged by the Richfield Police Department with any crime relating to the events of March 10-11, 2010."  AC ¶ 29.

In her grand jury testimony in the Tennessee Case, Jane Doe Four gave conflicting accounts of what happened at the Richfield party.  AC ¶¶ 30-31.  During October 2010 grand jury testimony, Jane Doe Four "stated she was not going to the Motel 6 to exchange sex for money and that '[she] never sell [her] body . . . No, I've never done that . . . .'"  AC ¶ 31 (quoting *United States v. Mohamud*, No. 3:10cr260, Dkt. No. 2560, at 3-4 (M.D. Tenn. June 8, 2012)) (incorrectly cited as Dkt. No. 2650) (submitted as DOJ Br. Ex. I, Dkt. No. 41-1).

4

The district court held a detention hearing on in November 2011, after Mohamud filed a motion to reconsider detention. *See* DOJ Br. Ex. D at 2. At this hearing, "the proof was that Jane Doe 4 was discovered in the motel bed nude and after wakening, she began crying and screaming. . . . Weyker testified that at the motel, Jane Doe 4 did not consent fo[r] anyone to have sex with her." AC ¶ 32 (quoting DOJ Br. Ex. I at 5). "Weyker additionally testified at the [November 2011] detention hearing that the markings on Jane Doe Four's vaginal area were the result of 'blunt force trauma.' . . . As [the Tennessee Case district court judge] noted: 'that phrase is not in the nurse's report.'" AC ¶ 33 (quoting DOJ Br. Ex. I at 5). "Weyker's fabricated evidence regarding Jane Doe Four led to Mohamud's continued detention." AC ¶ 34.

Around March 2012, a number of Mohamud's co-defendants went to trial. AC ¶ 53. Mohamud had moved to sever his case from their trial, and the district court granted the motion. *United States v. Mohamud*, 3:10cr260, Dkt. Nos. 1051, 1395 (M.D. Tenn. Jan. 11, 2012 & Feb. 16, 2012) (Mohamud's second motion to sever, and the district court order severing the charges against him); *see also* AC ¶ 53 ("Mohamud's trial was to begin after theirs."). In that trial, six of nine defendants were fully acquitted by the jury, but the jury convicted the other three defendants on some charges. *See* AC ¶ 55. The district court then granted those three defendants' Federal Rule of Criminal Procedure 29 motions for judgments of acquittal, on the basis of a variance. *See* AC ¶ 55; *United States v. Adan*, 913 F. Supp. 2d 555, 579 (M.D. Tenn. Dec. 19, 2012).

After that trial, Mohamud filed a sealed renewed motion for release based on changed circumstances. *United States v. Mohamud*, No. 3:10cr260, Dkt. No. 2435 (M.D. Tenn. Apr. 26, 2012). On June 8, 2012, the district court granted his motion, concluding that "[w]ithout evidence that [Mohamud] sexually trafficked a person in violation of federal law, the Court cannot find clear and convincing evidence for this Court's Order for the continued detention of

this Defendant." AC ¶ 35 (quoting DOJ Br. Ex. I at 7). He was released on pretrial conditions on June 15, 2012. AC ¶ 47.[3]

The government had appealed the district court's grant of the Rule 29 motions after the April 2012 trial, and in March 2016, the appellate court affirmed the district court. AC ¶ 56 (citing *United States v. Fahra*, 643 Fed. Appx. 480 (6th Cir. 2012)). "In its opinion, before it recounted the trial testimony and evidence, the [appellate court] noted '. . . that we start our analysis from what is likely a fictitious story.'" AC ¶ 56 (quoting *Fahra*, 643 Fed. Appx. at 484).

After the appellate court's opinion issued, the government moved to dismiss all remaining charges against all remaining defendants, and the court granted the motion on March 10, 2016. AC ¶ 57. Mohamud was then "finally released from electronic home monitoring and the other restrictions on his liberty." AC ¶ 58.

Like Osman, Mohamud alleges that the charges of a wide-ranging sex-trafficking conspiracy were baseless and that Weyker fabricated "the overwhelming majority of material evidence supporting his indictment," AC ¶ 39; that Weyker manipulated Jane Doe witnesses, including Jane Doe Four, into lying, *e.g.*, AC ¶¶ 36, 38, 60; that Weyker was motivated to falsify evidence by a desire for professional success, *see* AC ¶ 16; and that indications of Weyker's fabrication included questions surrounding the Jane Does' ages, AC ¶ 42, and the results of the Spring 2012 trial, AC ¶ 55. Also like Osman, Mohamud's complaint repeatedly cites to remarks about Weyker and the case by the district and appellate courts in the Tennessee Case, including a memorandum discussing Mohamud's detention. *E.g.*, AC ¶¶ 33, 40 n.1, 56, 63-64.

---

[3] On May 9, 2013, the district court filed a memorandum providing reasoning for its release of multiple defendants, including Mohamud. *See United States. v. Mohamud*, No. 3:10cr260, 2013 WL 1935506 (M.D. Tenn. May 9, 2013). The memorandum does not appear to provide any additional reasoning specific to Mohamud, who had been out on conditions since June 2012. *See, e.g.*, No. 3:10cr260, Dkt. No. 3044 (M.D. Tenn. Feb. 1, 2013) (order excusing Mohamud from attending a status conference in light of the fact that "he lives in Minnesota").

## IV. SUMMARY OF ARGUMENTS

A summary of the parties' arguments is included in Section IV of the Court's simultaneously filed opinion in *Yusuf v. Weyker, et al.*, No. 16cv1012. Mohamud is represented by the same counsel as Yusuf.

## V. LEGAL ANALYSIS

As explained fully in the Osman Opinion, pursuant to *Manuel v. City of Joliet*, 137 S. Ct. 911 (Mar. 21, 2017), Mohamud's claims sound, if at all, in the Fourth Amendment, not the Fifth or Fourteenth. *See* Osman Op. 11-13; *see also id.* at 17-22. His complaint is that "[b]ut for the testimony and other erroneous evidence falsely manufactured by Weyker and Bandemer, no probable cause existed to detain or otherwise restrict Mohamud's liberty." AC ¶ 1; *see also* AC ¶¶ 60-61. In other words, he complains "that a form of legal process resulted in pretrial detention unsupported by probable cause." *Manuel*, 137 S. Ct. at 919. So "the right allegedly infringed lies in the Fourth Amendment." *Id.* A "constitutional division of labor" applies to claims similar to Mohamud's. *Id.* at 920 n.8. Thus, because he challenges his pretrial detention, not a conviction and ensuing incarceration, his claim is under the Fourth Amendment. Mohamud's claims for substantive due process violations under the Fifth or Fourteenth Amendments therefore fail. *See Manuel*, 137 S. Ct. at 919-20; *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion).[4]

---

[4] As explained in a footnote in the Court's simultaneously filed order in *Yusuf v. Weyker, et al.*, No. 16cv1012, the attempt to distinguish *Albright* in his opposition papers, which were filed without the benefit of the *Manuel* decision, is not persuasive in light of the *Manuel* Court's clear interpretation of *Albright*. *See Manuel*, 137 S. Ct. at 918.

Under the Fourth Amendment analysis, the Court must decide whether Mohamud plausibly alleges that the Defendants violated his right to be free from unreasonable seizure by arresting and detaining him without arguable probable cause, based on fabricated evidence.[5]

To evaluate whether a person's Fourth Amendment right has been violated by an arrest pursuant to a warrant that lacked probable cause, the court applies the analysis set out in *Franks v. Delaware*, 438 U.S. 154 (1978). *See Hawkins v. Gage Cty.*, 759 F.3d 951, 958-59 (8th Cir. 2014); *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101, 105 (1st Cir. 2013). Thus, the court considers whether there were deliberately or recklessly false statements made in support of a finding of probable cause and whether those statements were necessary to the finding of probable cause. *See Franks*, 438 U.S. at 156; *Williams v. City of Alexander*, 772 F.3d 1307, 1311 (8th Cir. 2014). The court also considers whether material information was omitted with the intent to mislead or with reckless disregard as to whether the omission was misleading. *See Williams*, 772 F.3d at 1312; *Hawkins*, 759 F.3d at 959. If, setting aside the false statements (or adding in the omitted information), there was no probable cause to arrest, then the arrest violated the Fourth Amendment. *See Williams*, 772 F.3d at 1312-13; *Hawkins*, 759 F.3d at 958-59; *Hernandez-Cuevas*, 723 F.3d at 105. Probable cause "exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Greenman v. Jessen*, 787 F.3d 882, 888 (8th Cir. 2015) (citation omitted).

---

[5] Because the Court finds that only the Fourth Amendment, and not substantive due process, is applicable; because a Fourth Amendment claim in this case does not present a new context for a *Bivens* action; and because § 1983 and *Bivens* claims are analyzed similarly, the Court does not reach the question of whether Mohamud's claim should be brought under § 1983 or *Bivens*. *See* Osman Op. 13-17.

Where a plaintiff alleges that she was arrested without probable cause and the defendant asserts the qualified immunity defense, courts ask whether there was "*arguable* probable cause to arrest." *Stewart v. Wagner*, 836 F.3d 978, 984 (8th Cir. 2016) (citing *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015)) (applying this standard to a Fourth Amendment claim for detention based on allegedly false and incomplete information in a probable cause statement). "[T]he issue for immunity purposes is not probable cause in fact but arguable probable cause, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." *New*, 787 F.3d at 899. "It is clearly established that the Fourth Amendment requires a *truthful factual showing* sufficient to constitute probable cause before an arrest warrant can issue." *Peterson v. City of Plymouth*, 60 F.3d 469, 477 (8th Cir. 1995) (emphasis added and citation omitted).

### a. Analysis of Mohamud's Claim Under the Fourth Amendment

In considering whether Mohamud plausibly alleges a Fourth Amendment violation, the Court disregards mere conclusory statements, focuses on well-pleaded factual allegations, and applies its judicial experience and common sense. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The Court also properly considers the Tennessee Case court record in assessing the pleadings. *See, e.g.*, *Greenman*, 787 F.3d at 887.

Mohamud's core allegations are similar to Osman's, including the ample citations to comments by the Tennessee Case district court and a related appellate decision. In the Osman Opinion, the Court examines several orders and memoranda by the district court and two separate Sixth Circuit Court of Appeals opinions concerning the Tennessee Case, some of which both Osman and Mohamud cite. *See* Osman Op. 25-33. For instance, like Osman, Mohamud points to the results of the Spring 2012 trial. *See* AC ¶ 55. Also like Osman, he quotes the Sixth Circuit opinion affirming the grant of the Rule 29 motions. *See* AC ¶¶ 40 n. 1, 56. As an

9

example, they both quote the *Fahra* opinion's noteworthy description of "the story the prosecution presented at trial" as "likely a fictitious story." *See* AC ¶ 56 (quoting *Fahra*, 643 Fed. Appx. at 484). He also, like Osman, cites to footnote 10 of the district court's order in *Adan*, 913 F. Supp. 2d 555 (M.D. Tenn. Dec. 19, 2012), which mentioned "serious issues" and "concern" relating to Weyker's testimony. AC ¶ 64.

Mohamud also cites more extensively to court documents relating to his detention hearings, which Osman cites once. *Compare* Mohamud AC ¶¶ 30-33, 35, 63, *with* Osman SAC ¶ 46. *See also* GBBS DOJ Opp. 24. He highlights testimony by Jane Doe Four before the grand jury in July and October 2010 in which she gave inconsistent testimony, including initially failing to identify Mohamud, and ultimately denied ever participating in sex trafficking or knowing about others' participation. AC ¶¶ 30-31, 35. As Weyker and Bandemer point out, that Jane Doe Four gave apparently exculpatory testimony before the grand jury seems to weigh against an inference that Weyker coached or manipulated Jane Doe Four into giving false testimony to indict Mohamud and others. *See* DOJ Br. 80, Dkt. No. 40. But the fact remains that the grand jury indicted Mohamud in the sex-trafficking conspiracy after hearing Jane Doe Four and other witnesses' testimony, which at least possibly supports Mohamud's theory that the fabrication of evidence about a broader sex-trafficking conspiracy created the false appearance of probable cause as to him because of the nature of conspiracy charges. To this point, it is worth noting that the district court found, and the appellate court agreed, that the broad nature of the conspiracy charges caused "significant prejudice" to the defendants who stood trial in April 2016. *Fahra*, 643 Fed. Appx. at 493. Although Weyker and Bandemer did not make the prosecutorial charging decisions, it is alleged here that that they "beguiled" the prosecutors into pursuing "the fabricated case" of the widespread conspiracy. AC ¶¶ 40-41. Mohamed includes

well-pleaded facts to support his allegations, and the Court must accept his factual allegations as true and construe the pleaded facts in his favor at this procedural stage. *Greenman v. Jessen*, 787 F.3d 882, 885 & n.2 (8th Cir. 2015).

For example, Mohamed calls out a comment by the district court made in connection with his second detention hearing, which at least arguably casts a shadow on the integrity of the evidence about the Richfield events. *See* AC ¶ 33. At Mohamud's November 2011 detention hearing, the district court appeared to accept Weyker's testimony "that Linda Waltham, the nurse who administered the [sexual assault] examination [of Jane Doe Four in connection with the Richfield event], concluded that based upon her training and experience these types of injuries only occur when a victim suffers violent blunt force trauma during sexual assault." DOJ Br. Ex. D at 4. But six months later, after the 2012 trial netted no convictions, the district court noted in its opinion granting Mohamud's motion for reconsideration that "[a]lthough [O]fficer Weyker testified that these markings were the result of 'blunt force trauma', that phrase is not in the nurse's report." DOJ Br. Ex. I at 5; *see* AC ¶ 33.[6] This remark at least conceivably could be viewed as demonstrating the court's skepticism of Weyker's role in fact-gathering regarding the Richfield event.

Further, Mohamud specifically denies that he had non-consensual sex with Jane Doe Four and denies that he engaged in any attempt to have her engage in commercial sex. He alleges that he was never charged by the Richfield Police Department with any crime relating to the Richfield events. And he alleges that in June 2012, the court ordered his release from

---

[6] Some of the district court's findings of fact regarding the Richfield event remained unchanged from the November 2011 detention hearing to the June 2012 order reconsidering Mohamud's detention: "Jane Doe 4 was discovered in the motel bed nude and after wakening, she began crying and screaming. There were used condoms in the room and Jane Doe's panty was on the motel floor." DOJ Ex. I at 5. Moreover, the examination of Jane Doe Four revealed multiple tears to her vagina. *Id.* at 5.

11

custody on the basis that there was not "evidence that [Mohamud] sexually trafficked a person in violation of federal law . . . ." AC ¶ 35 (quoting DOJ Br. Ex. I at 7). This finding came after the district court was presented with transcripts of Jane Doe Four's grand jury testimony (to which Mohamud did not have access at the November 2011 detention hearing, *see* Ex. I at 2) and after the conclusion of the April 2012 trial of nine of his co-defendants.

In Osman's case, the Court found that some of the quoted and referenced statements by judicial officers are remarkable, and that taken all together along with other well-pleaded facts, they nudge Osman's Fourth Amendment claim as to Weyker over *Iqbal*'s plausibility line. Mohamud was exclusively charged in sex-trafficking-conspiracy counts. Like Osman, in addition to detailed references to particular remarks by the district and appellate court, Mohamud has included some factual allegations more specifically relating to his case. Therefore, consistent with the analysis in the Osman Opinion, *see* Osman Op. 17-20, 22-28, 35, the Court finds that Mohamud's allegations of a Fourth Amendment violation by Weyker in fabricating evidence related to sex trafficking also survive Weyker's motion to dismiss. The same caveats that the Court noted in the Osman Opinion apply as well to Mohamud's allegations.

Objecting to Mohamud's references to Weyker testimony, Weyker and Bandemer argue that witnesses are entitled to absolute immunity as to their testimony. DOJ Br. 79. But witnesses are not entitled to absolute immunity to their activities outside of the courtroom and preparation for testimony. *Rehberg v. Paulk*, 566 U.S. 356, 370 n.1 (2012). The Court does not rely on Weyker's testimony (or what of it has been cited in the complaint)—rather, the Court's focus is on the alleged implications of the district court's decisions to comment on some of her testimony.

Weyker and Bandemer also argue that the facts found by the district court about the Richfield event, *see* note 6, *supra*, "more than establish arguable probable cause to indict Mohamud and others on the sex-trafficking charges." DOJ Br. 80. Drawing all reasonable inferences in Mohamud's favor, and taking into account Jane Doe Four's grand jury testimony that she never engaged in sex for money, the Court cannot conclude at this Rule 12 stage that there was probable cause to indict or arrest Mohamud for sex trafficking in violation of 18 U.S.C. § 1591 after setting aside allegedly fabricated evidence related to the sex-trafficking conspiracy.[7] Moreover, Mohamud was charged with participation in a multi-state, nearly ten-year-long sex-trafficking conspiracy involving dozens of co-conspirators. He alleges well-pleaded facts sufficient to infer at the Rule 12 stage that there was fabrication of evidence tainting the probable cause findings as to the charged sex-trafficking-conspiracy offenses, which were the only charges against him.

The same cannot be said for Mohamud's allegations about Bandemer. His allegations as to Bandemer are conclusory and lacking well-pleaded facts. And none of the judicial statements that lend some plausibility to the allegations about Weyker refer to Bandemer in any way. Mohamud does not plausibly plead that Bandemer directly violated his civil rights. Bandemer is entitled to qualified immunity on Counts 1 and 5.

### b. Supervisory Liability

Mohamud also sues Bandemer and John Does 3-4 in their individual capacities as supervisors. He alleges that they were deliberately indifferent to or approved Weyker's and

---

[7] After the trial of some of his co-defendants and Mohamud's release from custody in June 2012, he was again indicted in Counts 1 and 2 in a Third Superseding Indictment. *See United States v. Mohamud*, No. 3:10cr260, Dkt. No. 2701 (M.D. Tenn. Aug. 22, 2012). Weyker does not raise this point. Even if she did, the Court would not find this fact dispositive at this stage in light of the allegations, supported by some well-pleaded facts including notable comments by judicial officers, that fabricated evidence fooled the grand jury into indicting.

13

Bandemer's alleged violations of his constitutional rights. AC ¶ 65.

A supervisor sued in his or her individual capacity in a § 1983 or *Bivens* suit "is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677; *see also S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Krigbaum*, 808 F.3d at 340 (citing *Livers*, 700 F.3d at 355). "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient." *Id.* The notice prong requires that "[t]o impose supervisory liability, other misconduct [allegedly giving the supervisor notice] must be very similar to the conduct giving rise to liability." *Id.* (quoting *Livers*, 700 F.3d at 356).

First, given the Court's conclusion that Mohamud has not adequately alleged a direct constitutional violation by Bandemer, the supervisory liability claims "automatically fail for lack of an underlying constitutional violation" to the extent they allege liability by John Does 3-4 for supervising Bandemer. *Mendoza v. U.S. Immig'n & Customs Enf't*, 849 F.3d 408, 420 (8th Cir. 2017) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986)).

Moreover, Mohamud's complaint, which is very similar to Osman's complaint as to the supervisory liability allegations, likewise contains few allegations—and fewer well-pleaded facts—regarding supervisory liability. Like Osman, he alleges that Bandemer and the John Does had supervisory responsibility over Weyker, *e.g.*, AC ¶¶ 8, 16; that the investigation was very important to the St. Paul Police Department vice unit, *see* AC ¶ 36; and that "[b]y at least

14

February 15, 2012, these [supervisory] defendants had actual knowledge" of Weyker's fabrications based on a February 2012 memorandum-order at Dkt. No. 1392 and other district court orders, AC ¶¶ 63-64, 66. Like Osman, Mohamed cites *United States v. Mohamud*, No. 3:10cr260, 2013 WL 1935506, at *11 n. 6 (M.D. Tenn. May 9, 2013), in which the district court reiterated its reasoning for releasing Mohamed from custody, *see* note 3, *supra*, and *United States v. Adan*, 913 F. Supp. 2d 555, 589 n.10 (M.D. Tenn. Dec. 19, 2012), in support of his supervisory liability notice allegations. AC ¶¶ 63-64.

As explained in the Osman Opinion, these allegations do not sufficiently plead supervisory liability based on notice. *See* Osman Op. 37-41. Nor do they establish a pattern of unconstitutional acts by Weyker. Ignoring conclusory or unsupported allegations, Mohamud does not allege any other similar acts by Weyker or Bandemer before the Tennessee Case investigation that could show a pattern about which Bandemer (as Weyker's supervisor) or the John Does (as Weyker's and/or Bandemer's supervisors) personally knew.

The allegations fail to state a claim for supervisory liability, and Bandemer and John Does 3-4 are entitled to qualified immunity as to these counts.

### c. Municipal Liability

Mohamud sues St. Paul as well as Bandemer and the John Does in their official capacities for municipal liability under *Monell v. Dept. of Social Servs. of the City of New York*, 436 U.S. 658 (1978). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. "Instead," a municipality is liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Id.*

15

A plaintiff therefore must show that there is an "official" policy or a "custom or usage with the force of law." *Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016). A plaintiff must plead "allegations, reference, or language by which one could begin to draw an inference that the conduct complained of . . . resulted from an unconstitutional policy or custom." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (citation omitted). "Misconduct among a municipality's employees must be 'continuing, widespread, [and] persistent' to establish such a custom." *Kelly*, 813 F.3d at 1075 (citation omitted). Also, "the municipality will not be liable unless policymaking officials exhibit '[d]eliberate indifference to or tacit authorization of such conduct . . . after notice to the officials of that misconduct.'" *Id.* at 1075-76 (citation omitted). The question is whether a "governmental policy or custom was the 'moving force' that led to the deprivation of [the plaintiff's] constitutional rights." *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002). Even if no individual employee is found liable, a municipality might be liable, but only where "the combined actions of multiple officials or employees may give rise to a constitutional violation." *Id.*

Mohamud does not adequately support his conclusory municipal liability allegations with well-pleaded facts. He does not allege with well-pleaded facts that Weyker or other St. Paul Police Department employees fabricated evidence in other investigations, nor that policymaking officials in the department were aware of any previous incidents of fabrication of evidence. He does not allege well-pleaded facts to support a theory that multiple St. Paul Police Department members—not even Weyker and Bandemer—combined to violate his rights. Nor does he allege facts that would demonstrate an official department *policy* that moved officers to fabricate evidence or coerce witnesses and mislead prosecutors and grand juries to secure indictments. He also does not plausibly allege any such *custom* because, among other reasons, he has not

adequately alleged notice, as explained above. The supervisory defendants sued in their official capacities, and the City of St. Paul, are entitled to qualified immunity on these claims.

VI. **Conclusion**

Defendants are entitled to qualified immunity on all counts except Counts 1 and 5 as to Weyker. As to Defendants Bandemer, John Does 3-4, and the City of St. Paul, the Court grants their motions and dismisses with prejudice. *See Ulrich v. Pope Cty.*, 715 F.3d 1054, 1060-61 (8th Cir. 2013); *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 635 (8th Cir. 2010).

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants Heather Weyker and John Bandemer's Motion to Dismiss [Dkt. No. 38] is GRANTED IN PART and DENIED IN PART consistent with the above opinion.

2. Defendant City of Saint Paul's Motion for Judgment on the Pleadings [Dkt. No. 44] is GRANTED.

3. Plaintiff Bashir Yasin Mohamud's Amended Complaint is DISMISSED WITH PREJUDICE as to Defendants John Bandemer, John Does 3-4, and the City of St. Paul.

4. Counts 1 and 5 of Plaintiff Bashir Yasin Mohamud's Amended Complaint are DISMISSED WITH PREJUDICE to the extent they plead violations of the Fifth and Fourteenth Amendments.

Dated: August 9, 2017　　　　　　　　　　　　　s/ Joan N. Ericksen
　　　　　　　　　　　　　　　　　　　　　　　JOAN N. ERICKSEN
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge